**PROSERVE CORPORATION,**
Petitioner and Appellee,

v.

**Jamesetta N. RAINEY, Respondent,**

and

**Job Service North Dakota, Respondent and Appellant.**

Civ. No. 950125.

Supreme Court of North Dakota.

Aug. 29, 1995.

---

and preparing and serving food. Terraseta Lesmeister, a coworker, was also a mess attendant. On July 18, 1994, Rainey and Lesmeister were terminated from employment for fighting on the job the previous day. Rainey applied for unemployment benefits; Lesmeister did not.

After an initial Job Service determination that Rainey was terminated for misconduct disqualifying her for benefits, Rainey appealed. The appeals referee conducted a hearing at which Rainey and ProServe's president and project manager testified. The referee determined that Rainey was entitled to benefits:

"The claimant was discharged primarily for an incident that occurred on July 17, 1994. The claimant was struck with a cooking pot by a co-worker following an argument. The claimant took the pot from the co-worker and struck her on the head. The claimant then observed the co-worker grabbing what appeared to be a knife and, in self-defense, took hold of a butcher knife. Both the claimant and co-worker were restrained at that moment. The claimant returned to her duties and, later that day, was discharged for fighting, which is in violation of company policy.

\* \* \*

"According to testimony taken at the hearing, the claimant reacted instinctively and in self-defense after she was attacked by a co-worker. The employer has not established that the claimant acted with wrongful intent or in substantial disregard of the employer's interests. Therefore, it must be concluded that although the employer may have had grounds to discharge the claimant, the employer has not established that the claimant acted in misconduct...."

Job Service affirmed the referee's decision, and ProServe appealed to the district court. The court reversed Job Service's decision, reasoning:

"[T]he decision and Findings of Fact and Conclusions of Law of the Agency are not supported by the evidence in this record. I agree with the Petitioner that even Respondent's version of the facts cannot sustain a factual finding of self-defense. Mu-

Douglas R. Herman, of Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd, Fargo, for petitioner and appellee.

Douglas A. Bahr, Asst. Atty. Gen., Atty. General's Office, Bismarck, for respondent and appellant.

VANDE WALLE, Chief Justice.

Job Service North Dakota appealed from a judgment reversing its award of unemployment compensation benefits to Jamesetta N. Rainey. We agree with the district court's conclusion that Rainey's conduct resulting in her discharge from employment with Pro-Serve Corporation constituted disqualifying misconduct, and we affirm.

In July 1994 Rainey was employed by Pro-Serve as a fulltime mess attendant at the Minot Air Force Base. Rainey's duties included cashiering, washing pots and pans,

tual combat is not, by definition, 'self-defense'.

"Further, the Findings totally ignore key parts of the altercation which is the subject of this appeal. Namely, the Respondent continued to fight after instructions to stop and continued to escalate the combat after her opponent was disarmed."

■ Our review of a Job Service decision is governed by N.D.C.C. § 28–32–19 of the Administrative Agencies Practice Act, which requires us to affirm the agency decision if: (1) its findings of fact are supported by a preponderance of the evidence; (2) its conclusions of law are sustained by the findings of fact; and (3) its decision is supported by the conclusions of law. *Kempel v. Job Service of North Dakota*, 531 N.W.2d 311 (N.D. 1995). We review the decision of Job Service, not the district court, *id.*, although here we agree with the district court's decision.

■ A person discharged for misconduct under N.D.C.C. § 52–06–02(2) is disqualified from receiving unemployment benefits. *Marion v. Job Service North Dakota*, 470 N.W.2d 609 (N.D.1991). Although not statutorily defined, the term "misconduct" is defined in our case law:

" '[Misconduct] is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed "misconduct" within the meaning of the statute.' "

*Perske v. Job Service North Dakota*, 336 N.W.2d 146, 148–149 (N.D.1983) (quoting *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636, 640 (1941)).

■ Whether an employee's behavior is misconduct depends in part on the nature of the work and presents a mixed question of fact and law. *Holiday Inn v. Karch*, 514 N.W.2d 374 (N.D.1994). Our review of a mixed question of fact and law involves a determination of whether the evidence supports the agency's findings of fact and, in turn, whether those findings of fact sustain the agency's conclusion. *Medcenter One, Inc. v. Job Service North Dakota*, 410 N.W.2d 521 (N.D.1987). On disputed facts, we defer to the agency's findings and consider only whether a reasoning mind could have reasonably determined that the factual conclusions were proved by a preponderance of the evidence. *Hins v. Lucas Western*, 484 N.W.2d 491 (N.D.1992). When the agency's conclusion of law regarding misconduct is based on undisputed facts and contradictory inferences cannot reasonably be drawn from the undisputed facts, we review that conclusion anew. *Hulse v. Job Service North Dakota*, 492 N.W.2d 604 (N.D.1992).

According to Rainey, the incident occurred while she was training a new employee in the presence of Lesmeister and their supervisor, Gladys Stevens. Raymos and Rock, Air Force cooks, also became involved. Rainey testified:

"A. ... I was talking to Gladys, well, Terraseta, whoever was in pots this morning has to clean up, which was Terraseta was standing right there. And Terraseta she turned around, 'Jamesetta, if you got anything to say, you say it in my face.' I said, 'Terraseta,' I said, 'I know you're having a bad day.' I said, 'You know, I'm not the one.' And the phrase I'm not the one is, you know, you just don't mess with us, you know what I'm saying? You can't just pick on us and get away with it. So she turned around, 'Jamesetta, you got anything to say, you say it in my face.' And I said, 'Well, Terraseta, I'm not talking to you, I'm talking to Gladys. This is between Gladys and I.' And Gladys said, 'Well, Terraseta, she's talking to me.' And Terraseta kept on rambling on and we started going at it. She was saying, 'Well, just because you big and tall, don't mean

all and everything,' because I am a whole lot taller than her and everything. So, one thing led to another, before I knew it she swung at me. I swung back at her. And then she reached down in the sink. One of the pots had leaked. I grabbed the pot from her from my left hand, put it over in my right hand, and swung it back at her. And to me that was self-defense. I guess I must have lost it or something because she reached in the sink to pull out something else, and I went and got the nearest thing I could find and that was a butcher knife, which, you know, I should say that was wrong. I—I must have just been out of it, you know. I don't know what it was. I guess from where I grew up at you just kind of just freak out sometimes I guess.

\* \* \*

"Q. ... So she swung at you with a pot, and you grabbed it and you swung it at her?

"A. Yes. I took the pot from her after she hit me with it.

"Q. Where did she hit you?

"A. She hit me like on my arm.

"Q. Okay. And then where did you hit her at?

"A. When I swung it, I guess I popped her on the head because she's so short. You know, when I swung it back, I guess it must have just went down because she's a whole lot shorter than me. I guess she's about 4 foot something. I don't know, 4 foot or 5 something.

\* \* \*

"Q. Okay. So then anyway, she swung, hit you in the arm, you turn around and grab the pot—

"A. Hold that, and then at that time, as I was swinging, I felt somebody's arm trying to stop me and pull me back. You know what I'm saying?

"Q. Okay.

"A. So—I just kind of went back and then she took out something, out of the sink with a black handle and it looked like it was silver coming up. And working with pots, you clean everything. And I was thinking a, you know, she's coming after

me with a knife, you know, or whatever, so before I knew it, that's what I grabbed and I was wrong for doing that. I guess I was just—I wasn't gonna get until she came after me first. ...

\* \* \*

"Q. Okay, did you ever see what it was?

"A. No, I didn't. Because I was just like—I just like went out of it. You know what I'm saying?

"Q. You saw her reach for something with a handle, you saw her pull something—

"A. And I just grabbed something to defend myself, you know.

"Q. Okay. And then you grabbed a knife.

"A. Yes, I did.

"Q. Okay. And then what happened?

"A. Then we were arguing because Raymos was holding me back and Rock and Gladys was holding Terraseta. They got Terraseta out the office.

"Q. Okay, so—

"A. So they had Terraseta in the office. I went back to work. I put the knife up and went back to work. I heard people in the background say, 'Jamesetta, she's not worth it.'

"Q. Okay. So let's go back just a minute here now. So, as far as it got then was you grabbed a butcher knife in self-defense?

"A. Yes, I did.

\* \* \*

"Q. [D]id you go after her?

"A. No. Because—

"Q. Did she come after you?

"A. Sergeant Raymos—she was coming toward me and Gladys and Rock pulled her back and Sergeant Raymos had me back.

\* \* \*

"Q. Both of you were restrained then?

"A. Yes."

■ We have upheld denial of unemployment benefits to an employee who was discharged for a single incident of physical force or violence where that conduct violated an

employer rule designed to insure safety and efficiency. *Blueshield v. Job Service North Dakota*, 392 N.W.2d 70 (N.D.1986). Even without a written rule, courts have denied benefits, holding that an employee reasonably owes a duty to the employer to refrain from fighting on the employer's premises during working hours. Annot., *Employee's act or threat of physical violence as bar to unemployment compensation*, 20 A.L.R.4th 637, § 6 (1983). There are exceptions to the general rule, and when an employee acts reasonably to defend against an unprovoked assault by a coworker, unemployment compensation cannot be denied for fighting on the job. *See, e.g., Hodges v. Everett*, 2 Ark. App. 125, 617 S.W.2d 29 (1981); *Escamilla v. Industrial Com'n of Colo.*, 670 P.2d 815 (Colo.Ct.App.1983); *Smithson v. Review Bd. of Ind. Emp. Sec.*, 446 N.E.2d 1014 (Ind.Ct. App.1983); *Peeples v. Com., Unemp. Comp. Bd. of Review*, 104 Pa.Commw. 504, 522 A.2d 680 (1987); *Mississippi Emp. Sec. v. McLane–Southern*, 583 So.2d 626 (Miss. 1991); *General Motors Corporation v. Labor and Industrial Relations Commission of Missouri*, 653 S.W.2d 702 (Mo.Ct.App.1983). Although an employee has a right to defend against physical assault, an employee's actions that go beyond legitimate self-defense can constitute misconduct disqualifying the employee from unemployment benefits. *See, e.g., Clark v. Com., Unemployment Compensation Bd.*, 69 Pa.Commw. 625, 452 A.2d 106 (1982); *Wolfe v. Commonwealth, Unemployment Compensation Board*, 57 Pa.Commw. 255, 425 A.2d 1218 (1981); *Unemployment Comp. Bd. of Rev. v. Vojtas*, 23 Pa.Commw. 431, 351 A.2d 700 (1976).

 Here, Job Service does not dispute ProServe's characterization of the butcher knife as a "deadly weapon." Under North Dakota criminal law, a person is justified in using deadly force to defend herself against "danger of imminent unlawful bodily injury" (N.D.C.C. § 12.1–05–03), if it "is necessary to protect the actor or anyone else against death, serious bodily injury, or the commission of a felony involving violence," but not "if it can be avoided, with safety to the actor and others, by retreat or other conduct involving minimal interference with the freedom of the person menaced." N.D.C.C.

§ 12.1–05–07(2)(b). *See Sampson v. State*, 506 N.W.2d 722 (N.D.1993). But, contrary to what the dissent states, there was no knife in Lesmeister's hand, and, contrary to what the dissent seems to suggest, whether or not Rainey would have a justifiable defense to a criminal charge such as assault with a weapon likely to cause serious injury, *see* § 12.1–17–01.1, N.D.C.C., is not the standard. However, this duty to retreat and attempt to avoid an altercation before resorting to deadly force also exists in the civil context. *See* Restatement (Second) of Torts, § 65(3)(a) (1965) [privilege of using deadly force does not exist if actor correctly or reasonably believes he can safely avoid necessity of defending himself by retreating if attacked in any place other than his dwelling place].

 In this case, Rainey took the pot away from Lesmeister, hit her on the head, and grabbed a butcher knife. Although Rainey believed Lesmeister may have been grabbing a knife, Rainey concedes she "was wrong for doing that" and that she "must have lost it." Both Rainey and Lesmeister had to be held back by others to stop the altercation. Having to be restrained from attacking with a butcher knife a similarly restrained aggressor is the antithesis of self-defense. Rainey's own version of the incident establishes that the confrontation had escalated into mutual combat. At that point, neither person was justified in using force. *See* N.D.C.C. § 12.1–05–03(2)(b). We conclude that Rainey's conduct went beyond self-defense and constituted disqualifying misconduct precluding her from receiving unemployment benefits.

Job Service asserts that, even if Rainey did not act in self-defense, she is entitled to benefits because her "poor judgment in striking a retaliatory blow does not constitute misconduct." We have recognized that "[a]n isolated hotheaded incident certainly will not necessarily result in disqualification of unemployment compensation benefits because of 'misconduct.'" *Blueshield*, 392 N.W.2d at 74. But the "retaliatory blows" at issue in most of the "isolated hotheaded incident" cases relied on by Job Service were relatively minor acts of violence in comparison to Rai-

ney's actions. *See, e.g., Guest v. Administrator, Unemployment Comp. Act,* 22 Conn.Sup. 458, 174 A.2d 545 (1961) [claimant struck supervisor who was verbally harassing him]; *Garguilo v. Unemployment Appeals Comm'n,* 642 So.2d 784 (Fla.Ct.App.1994) [claimant threw pen-sized radio at coworker who had verbally harassed him]; *General Asphalt Co. v. Harris,* 563 So.2d 803 (Fla.Ct. App.1990) [claimant hit coworker on hand with shovel for throwing hot asphalt pebbles at him]; *Toney v. Francis,* 618 So.2d 597 (La.Ct.App.1993) [claimant threw carton of milk at coworker who hit her in the back as she passed by]; *Demech v. Bd. of Review, Dept. of L. & I.,* 167 N.J.Super. 35, 400 A.2d 502 (1979) [claimant threw meat roast at coworker who was verbally harassing her].

■ In *Anderson v. Florida Unemployment Appeals Comm'n,* 517 So.2d 754 (Fla. Ct.App.1987), also relied on by Job Service, the claimant, who cut the coworker slightly on the hand with a knife after being struck in the ribs with a two-by-four, was found eligible for benefits. To the extent *Anderson* can be interpreted as equating the attempted use of deadly force with "poor judgment" and an "isolated hotheaded incident" that will not disqualify a claimant from receiving unemployment benefits, we decline to follow it. Rainey attempted to use deadly force against a restrained coworker. Although Rainey may have momentarily "lost it," we do not believe her excessively violent actions properly belong in the "isolated hotheaded incident" genre of cases.

Rainey was aware of ProServe's policy against fighting. She grabbed a butcher knife and had to be restrained from attacking Lesmeister. Even though Lesmeister was the initial aggressor, Rainey's escalation of the encounter into a life-threatening situation constituted misconduct evidencing a willful disregard of her employer's interests.

The position Job Service seeks to have us adopt recognizes little or no proportionality between the incident provoking a need for self-defense and the appropriate response to that need. Under these facts the use of a butcher knife is unjustified and disproportionate to the need to defend. Characterization of the use of the knife as an isolated incident trivializes the magnitude of the seriousness of Rainey's actions.

We conclude that Job Service's conclusions of law are not sustained by its findings, and its decision cannot be supported by those conclusions of law. The district court judgment is affirmed.

SANDSTROM, J., concurs.

MESCHKE, J., concurs in the result.

MICHAEL O. McGUIRE, District Judge, sitting in place of LEVINE, J., disqualified.

NEUMANN, Justice, dissenting.

This Court has repeatedly and consistently said judicial review of an administrative agency's findings of fact is limited to whether a reasoning mind could have reasonably determined that its findings were supported by the evidence. *Fischer v. North Dakota Workers Compensation Bureau,* 530 N.W.2d 344 (N.D.1995); *BKU Enterprises, Inc. v. Job Service North Dakota,* 513 N.W.2d 382 (N.D.1994); *Johnson v. North Dakota Workers Compensation Bureau,* 496 N.W.2d 562 (N.D.1993). Despite that consistent warning to respect the authority of the other separate, co-equal branches of government, both the district court and the majority in this case have retried the evidence and drawn their own inferences and actual conclusions in order to reach a preferred result.

I certainly do not condone the violent behavior reflected in this case, whether found in the workplace or elsewhere, and had I been the agency's hearing officer, I might well have found Rainey's behavior was mutual combat, as do the trial court and the majority. But what I think and what I might have found are beside the point. My job here is not to find, but to review, and to do it within the limits we have articulated.

I cannot join Judge McGuire's dissent, because he, too, has reviewed the evidence in order to draw his own inferences and factual conclusions. However, his opinion certainly supports an argument that a reasoning mind can reasonably determine that the agency's findings are supported by the evidence. Applying that standard of review, I believe we

have no choice. The agency's order should be affirmed.

MICHAEL O. McGUIRE, District Judge, dissenting.

It is with great respect for the members of this Court that I must dissent in this instance. At the onset, it is worthy of note that Rainey was the only nonhearsay witness to give testimonial evidence. Hence, as the majority indicates, through Chief Justice VandeWalle, we review the Appeals Referee's conclusion of law regarding misconduct on the undisputed facts that Rainey has supplied. It is further indicated in the majority opinion that there are exceptions to the general rule, whether employer mandated or caselaw generated, that an employee reasonably owes a duty to the employer to refrain from fighting on the job. Hence, "there are exceptions to the general rule, and when an employee *acts reasonably to defend against an unprovoked assault by a co-worker*, unemployment cannot be denied for fighting on the job. (Citations)" *(Emphasis by this writer.)*

All appear to agree that characterization of a knife as a dangerous weapon under the facts set forth herein is proper. Further, under North Dakota caselaw, also as set forth by the majority, to prevent imminent unlawful bodily injury, "serious bodily injury, or the commission of a felony involving violence," Rainey had a right to offer use of deadly force to protect herself unless she could, with safety, retreat or engage in other conduct sufficient to avoid the altercation.

Under the salient facts of this case, Rainey, possessed with the same knowledge her employer had of her co-worker's established propensity for violence,[1] while talking to a superior was verbally confronted by Lesmeister, suffered an unprovoked physical assault with, in effect, a weapon, to-wit the metal pot, was able to wrest the pot away, and instinctively swung back, hitting the attacker once with the pot. She then felt her arm being pulled back and went along with it only to see her attacker pull out a knife and

start after her with it, whereupon Rainey grabbed a knife and assumed a defensive posture by waiting while her attacker advanced, pressing the attack to her. Then both were restrained and had words.

There is no dispute that the entire incident happened in one short continuous nonstop period of time. There was no time for detached reflection, only time to react instinctively.

There further appears to be no disagreement that the initial physical attack against Rainey was unprovoked and that her instinctive reaction when struck to defend herself by grabbing the pot does not present a problem. The majority does not appear to attach significance to the strike with the pot Rainey gave her aggressor after she grabbed it. Perhaps it is because it appears to be a situation where Rainey was engaged in continuous defensive conduct of grabbing and striking in a traditional *defensive* counterattack which in her instance was to no avail. It was not enough. Rainey's attacker did not pause. Instead the attacker escalated to the next available weapon, the knife, by accepted characterization a deadly weapon. Rainey stops, her attacker advances, and both are restrained. Here the majority appears to draw the line and sees Rainey somehow transformed from victim to aggressive attacker charged with escalating the violence in the work place. The majority states:

> Having to be restrained from attacking with a butcher knife a similarly restrained aggressor is the antithesis of self-defense. Rainey's own version of the incident establishes that the confrontation had escalated into mutual combat. At *that point*, neither person was justified in using force. (Citation) We conclude that Rainey's conduct went beyond self-defense and constituted disqualifying misconduct precluding her from receiving unemployment benefits. (Emphasis by this writer.)

Does Rainey's version of the incident show that she had to be restrained from attacking with a knife and that the fight actually esca-

---

1. Lesmeister had been counseled by ProServe approximately two months earlier for striking a pregnant co-worker in the stomach.

lated into some kind of consensual back and forth mutual combat? Most assuredly Rainey's unaimed defensive blow with the pot, which did not serve to stop the attack, did not make Rainey the aggressor. Rainey's additional testimony on that point is as follows:

> A. And I took it from her—I grabbed it from her as she was hitting me, I grabbed it. And I swung it back and hit her and it just happened to pop her on the head because she's so much shorter than I am.

> * * *

Here then is Rainey's unaimed defensive blow which did not serve to slow her attacker. Since it is at this point that escalation occurs when the first deadly weapon makes its appearance, it may be advantageous to iterate the pertinent portions of North Dakota's self-defense law as contained in N.D.C.C. 12.1–05–03. To paraphrase, one has the right in North Dakota to use deadly force to defend herself against "danger of imminent unlawful bodily injury" and, in this instance, "serious bodily injury," or the commission of a felony involving violence, unless it can be avoided, with "safety" to the actor, by retreat or conduct in an attempt to avoid the altercation before resorting to deadly force. This, in essence, is the law applicable.

We are constrained then to look at this particular situation through Rainey's eyes as long as her belief is reasonable. No one has disputed the fact that Rainey could have reasonably believed that a knife had been brought into play against her. Her testimony on this point is as follows:

> Q. Some. Okay. So you saw that she was reaching for something with a handle.
> A. At the sink at me.

> * * *

and

> Q. Okay. And you thought she was taking out a knife?
> A. Yes.

> * * *

It is important to note that at this point Rainey has nothing in her hands. Further, the situation is nonstop. It is ongoing and progressing rapidly. The question becomes whether Rainey reasonably believes she could in some manner turn or backpedal to retreat in safety. No one ever asked her at hearing. Also, we have not been furnished with any knowledge or description of the physical layout that Rainey and Lesmeister were in except that a sink was apparently in a close location. We do know the two were in a face to face position and in fairly close physical proximity. It is at this point that the second knife comes into play when Rainey grabs it from some location. We also know that Rainey's aggressor did begin to press a knife attack by coming toward Rainey and further that Rainey did not respond but maintained a defensive posture. Rainey testified:

> Q. Did you—did you go after her?
> A. No. Because—
> Q. Did she come after you?
> A. Sergeant Raymos—she was coming toward me and Gladys and Rock pulled her back and Sergeant Raymos had me back.
> Q. Okay. So—
> A. In a—
> Q. Both of you were restrained then?
> A. Yes.

> * * *

Further evidence of Rainey's lack of propensity to press any edged weapon attack on her aggressor is evidenced by a portion of Rainey's testimony as set forth by the majority which testimony, in pertinent part, is as follows:

> A. ... And I was thinking a, you know, she's coming after me with a knife, you know, or whatever, so before I knew it, that's what I grabbed and I was wrong for doing that. I guess I was just—I wasn't gonna get until she came after me first.
> ...

As far as this writer's legal knowledge extends, feelings of guilt or wrongdoing, after the fact, and evidenced by statements such as "I was wrong for doing that" or such as "I must have lost it" do not provide or create a conclusion of law nor can the same replace the statutory law of self-defense.

It appears clear that Rainey never attacked with a knife. She went into a defen-

sive posture with it, and she felt it should not have happened. On the other hand, her co-worker continued an already ongoing attack escalating it to an edged weapon even in the face of Rainey's initial, and by all appearances quite reasonable defensive counterattack. Further, even though Rainey lost her cool, and she ought to be afforded the protection anyway of the old maxim that "the law does not demand detached reflection in the face of an uplifted blade," Rainey should be commended for retaining a defensive posture with her weapon of defense. She can hardly be held to have had to defend herself against a knife with bare hands in the situation she was faced with.

Finally, and most importantly, what happened when Rainey and Lesmeister were restrained is evidenced by the only available nonhearsay evidence on that issue by Rainey as follows: (NOTE: This was immediately upon restraining of both.)

Q. Okay. And then what happened?

A. Then we were arguing because Raymos was holding me back and Rock and Gladys was holding Terraseta. They got Terraseta out the office.

\* \* \*

Rainey is perhaps not the most articulate witness to have offered testimony in a case which has come before this Court. Luckily, it is clear from Rainey's other testimony that when she states, "... Raymos was holding me back ...," she was not referring to herself pressing an attack with a knife. Two people hold back the smaller attacker and one holds back the larger defender. So far the situation does not smack of a mutual combat scenario in any easy fashion. However, this writer cannot help but be struck by the lack of support for the majority's apparent conclusionary comments as applied to the facts of the instant case in pertinent part wherein it is concluded:

Both Rainey and Lesmeister had to be held back by others to stop the altercation. Having to be restrained from attacking with a butcher knife a similarly restrained aggressor is the antithesis of self-defense. ... At that point, neither person was justified in using force. (Citation)

Certainly this writer would agree at that point neither was justified in using or attempting to use force. However, the fact is that Rainey never had to be restrained from attacking with the butcher knife. As the only evidence on that point shows, she was in a defensive posture awaiting the attack that was on its way until such time as Lesmeister was restrained along with Rainey. It was at this point that the Court concludes that Rainey's conduct went beyond self-defense and was disqualifying misconduct precluding her from receiving her unemployment benefits.

The majority says that:

Rainey was aware of ProServe's policy against fighting. *She grabbed a butcher knife and had to be restrained from attacking Lesmeister.* Even though Lesmeister was the initial aggressor, Rainey's escalation of the encounter into a life-threatening situation constituted misconduct evidencing a willful disregard of her employer's interests. (Emphasis by this writer.)

I must respectfully disagree with my learned colleagues with regard to their version of the evidence and the ensuing statements with regard to what they propose Rainey did. According to the evidence, Lesmeister escalated from verbal to physical attack with blunt instrument and then to deadly force with a knife. This writer is of the opinion that Rainey's conduct did not go beyond a reasonable self-defense. The evidence does not show otherwise. We do not know that Rainey could have safely retreated or whether in the midst of that rapidly deteriorating situation she could have resorted to some, as of yet unarticulated, alternative conduct. Words immediately subsequent to the incident can hardly suffer interpretation as mutual combat. Rainey's instinctive survival reactions in responding to an aggressive attack on her person by a co-worker with known propensities for violence with two separate weapons appears to have been downright reasonable. Rainey was faced with serious bodily injury by virtue of her facing an ongoing aggravated assault, the commission of a felony with violence. Peace officers across this country are trained in the so-called "seven yard rule." That is, they are

trained to shoot an advancing aggressor armed with a knife at 21 feet. However, without the use of a peace officer's training and tools, Rainey survived in her physical person and should survive legally as well by being awarded her benefits.

The majority next disposes of an alternative theory offered by Job Service which the service calls "poor judgment." The majority refers to the same theory as a "... hotheaded incident ..." type theory. Job Service offers the case of *Anderson v. Florida Unemployment Appeals Comm'n,* 517 So.2d 754 (Fla.Ct.App.1987), which case appears to reflect this Court's earlier proffered maxim of "the law does not demand detached reflection in the face of an uplifted blade." The majority declines to follow this case, with qualification. The case appears to me to be enough on point with the case before us. I would follow it, and I would affirm the Appeals Referee's succinct and clear opinion with regard to this case.

I must conclude that Job Service's conclusions of law are indeed sustained by its findings and that its decision is supported by those conclusions of law. It was not Rainey who escalated the encounter into a life threatening situation, and hers was not misconduct evidencing willful disregard of her employer's interests.

Further, I see nothing which is unjustified and disproportionate to the need to defend when a deadly weapon is first pulled on Rainey and she counters with the same but in a defensive posture. There is no peace officer in this land who would not hesitate to resort to the putting in hand of a firearm when faced with a knife and utilizing the same upon an individual who is advancing with the knife. Whether on the street, in their home, or in the work place, the citizens of this State are entitled to the same right of self-defense of their person as any trained and equipped peace officer.